UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VAUGHN JONES, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Civil Action No. 14-12211-ADB |
| CAROLYN W. COLVIN, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

March 31, 2016

BURROUGHS, D.J.

Plaintiff Vaughn Jones ("Mr. Jones") has brought this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Social Security Disability Insurance ("SSDI") benefits. The matter is presently before the Court on the Plaintiff's Motion for Judgment [ECF No. 15], by which Mr. Jones is seeking a remand for the payment of benefits or, alternatively, for further administrative proceedings. The matter is also before the Court on the Commissioner's Motion to Affirm the Decision [ECF No. 16], by which the Commissioner is seeking an order affirming his decision to deny Mr. Jones' claim for benefits. At issue is whether the Administrative Law Judge ("ALJ"), in reaching his decision that Mr. Jones was not disabled, erred by: (1) failing to consider the entire psychiatric record in determining the scope of Mr. Jones' residual functional capacity ("RFC"), (2) improperly relying on testimony from a vocational expert ("VE"), and (3) improperly evaluating Mr. Jones' credibility.

For the reasons explained herein, Plaintiff's Motion is <u>DENIED</u> and the Commissioner's Motion is <u>GRANTED</u>.

## I. STATEMENT OF FACTS

Mr. Jones was born on December 9, 1966. [R. 35].[1] He has a high school education and attended college for one year. <u>Id.</u> at 37. At the time of his hearing, he had four children, ranging in age from one month to seventeen years old. <u>Id.</u> at 36. Mr. Jones spent three and one half years in the military and was honorably discharged. <u>Id.</u> at 37-38. Except while serving in the military, Mr. Jones worked as a mason and bricklayer, beginning in approximately 1984 or shortly prior, and continuing up to the date of his alleged disability. <u>Id.</u> at 39-41.

On November 20, 2009, Mr. Jones was the victim of an attempted robbery in the course of which he was stabbed with a knife in various places, including his left arm. <u>Id.</u> at 41-43. Prior to the date of the attempted robbery, he had arthritis in his right knee as a result of an injury suffered in the military. <u>Id.</u> at 43-44. According to Mr. Jones, subsequent to the attempted robbery, two psychiatrists, Doctors Theodore and Dmochowski, have both told him that he is suffering from depression and paranoia in addition to his physical ailments. <u>Id.</u> at 46-47.

Mr. Jones lives with his mother. <u>Id.</u> at 38-39. He is able to take care of himself in terms of dressing, bathing, and the like. <u>Id.</u> at 49. He can walk and stand for long periods of time; use stairs; has normal use of his right hand; and can pick up 50 pounds from the floor. <u>Id.</u> at 52-54. He spends the majority of his day sitting in the house and watching television. <u>Id.</u> at 49, 57. He sees his children on the weekends and spends most of his time with them also watching

---

[1] References to pages in the administrative record, including the ALJ's decision and the hearing transcript, shall be cited as "R. __."

television. Id. at 51, 56-57. Mr. Jones did not return to work after the attempted robbery, and he has remained out of work since that time. Id. at 41.

## II.   PROCEDURAL HISTORY

Mr. Jones filed an application for SSDI benefits on January 28, 2010, claiming that he had been unable to work since November 20, 2009 as a result of injuries suffered during the attempted robbery. [R. 146-152]. To qualify for SSDI benefits, an individual must become disabled during the period that he is insured by the program. See 20 C.F.R. § 404.131. It is not disputed that Mr. Jones meets the insured status requirements of the Social Security Act. He was insured from the date of his injury through December 31, 2012. [R. 21]. Mr. Jones' application was denied initially on May 14, 2010 and upon reconsideration on November 19, 2010. Id. at 20. Subsequently, Mr. Jones requested a hearing before an ALJ. Id. The request was granted and the hearing took place on October 18, 2011. Id. Mr. Jones, represented by attorney Jerad Dupont, appeared and testified at the hearing. Id. at 32, 35-58.

## III.   THE ALJ'S DECISION

As described above, in order to qualify for SSDI benefits, Mr. Jones had to establish that he was disabled prior to the expiration of his insured status on December 31, 2012. The ALJ concluded that from November 20, 2009 through the date of his decision, November 22, 2011, Mr. Jones was not "under a disability within the meaning of the Social Security Act," which defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." [R. 7-8, 20-21]; see also 42 U.S.C. § 423(d)(1)(A). It is not disputed that the ALJ, in determining that Mr. Jones was not disabled, applied the five-step sequential

evaluation mandated by 20 C.F.R. § 404.1520. The following is a summary of the analysis, which is more fully detailed in the ALJ's "Findings of Fact and Conclusions of Law." [R. 9-18, 22-29].

The first inquiry in the five-step process is whether the claimant is "engaged in substantial gainful work activity." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. See id. In the instant case, the ALJ determined that Mr. Jones had not engaged in substantial work activity during the period from his alleged onset date of November 20, 2009 through his last insured date of December 31, 2012. [R. 22]. This finding of the ALJ is not disputed.

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If not, the claimant is considered not disabled and the application for benefits is denied. See Seavey, 276 F.3d at 5. Here, the ALJ concluded that Mr. Jones suffered from four severe impairments, specifically ulnar nerve damage to his left arm, degenerative joint disease in his right knee, depression, and anxiety. [R. 23]. This finding is not disputed.

The third inquiry is whether the claimant has an impairment equivalent to a specific listed impairment contained in Appendix 1 of the Social Security regulations, in which case the claimant would automatically be found disabled. See Seavey, 276 F.3d at 5; 20 C.F.R. § 404.1520(d). The ALJ concluded that Mr. Jones' impairments, either alone or in combination, did not meet or medically equal any of the listed impairments. [R. 23]. This finding is also not disputed.

Because the ALJ determined that Mr. Jones' impairments did not meet or equal any of the listed impairments, he proceeded to the fourth inquiry in the evaluation process which is whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work." Seavey, 276 F.3d at 5. It is at this point in the analysis that the ALJ determined Mr. Jones' RFC. Specifically, the ALJ found, "[a]fter careful consideration of the entire record," that

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that does not require any crawling and more than occasional pushing, pulling, reaching, handling or fingering with the upper left extremity. The claimant must avoid concentrated exposure to extreme cold, or work environments that involve unprotected heights, hazardous machinery and loud noises. The claimant is limited to unskilled jobs in a low stress setting with occasional changes, that do not require an assembly line production pace and that do not involve more than occasional superficial brief exchanges requiring no judgment with the public, and do not require working in close coordination with co-workers or as part of a team.

[R. 25].

In reaching his conclusion regarding Mr. Jones' RFC, the ALJ summarized Mr. Jones' testimony about his ability to work given the injury to his left arm and the related anxiety and depression. [R. 26]. "After careful consideration of the evidence," the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. The claimant's description of his ability to do the above exertional activities associated with work is credible and is consistent with the treating source statements as well as physical exam findings." Id. The ALJ then detailed the related functional capacity statement prepared by Mr. Jones' primary care physician, Dr. Mariano, in which Dr. Mariano opined that Mr. Jones could stand, walk, or sit for up to three hours each and could do more than six hours of each during a normal eight-hour work period, as well as lift or carry up to ten

5

pounds continuously and up to twenty pounds occasionally, with some other limitations on the use of his left arm. Id.

The ALJ next found that he was "not persuaded by claimant's statements concerning the intensity, persistence and limiting effects of his combined symptoms" and that Dr. Mariano's residual functional capacity assessment "is well supported by the record and no additional limitations are warranted." Id. He concluded that Mr. Jones' "allegation of disability is not credible." Id. In support of this, the ALJ reviewed reports prepared by Dr. John Dmochowski, a staff psychiatrist at the VA, who met with claimant in November 2010 and then again in October 2011. Id. at 27. Dr. Dmochowski's treatment notes revealed that, though Mr. Jones experiences symptoms of depression and anxiety related to the attack on him, "he still retains the capacity to socially interact in a clinical setting, to maintain his personal appearance and grooming as well as to sustain attention and concentration while carrying out simple tasks." Id. at 27-28. Further, after reviewing the notes, the ALJ concluded that there was "no evidence of a cognitive impairment, memory impairment or thought disorder" and that "[h]is insight and judgment are within normal." Id. at 28.

Based on Mr. Jones' RFC, the ALJ found that Mr. Jones was unable to perform his past relevant work as a bricklayer. Id. Consequently, the ALJ reached the fifth and last step in the sequential analysis.

The fifth inquiry is whether, given the claimant's RFC, education, work experience and age, he is capable of performing other work. See Seavey, 276 F.3d at 5; 20 C.F.R. § 404.1520(g). If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g). At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5. In response to questioning from the ALJ,

which incorporated the limitations included in Mr. Jones' RFC, the VE testified that Mr. Jones could work as an usher, locker room attendant, and checkroom attendant. [R. 64-65]. Using this testimony, the ALJ concluded that "the claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Id. at 29. Accordingly, the ALJ found that Mr. Jones was not disabled. Id.

Additional factual details relevant to this Court's analysis are described below where appropriate.

## IV. ANALYSIS

### A. Standard of Review

Mr. Jones is seeking judicial review of the Commissioner's "final decision" pursuant to the Social Security Act § 205(g), which provides in relevant part that:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by *substantial evidence*, shall be conclusive . . .

42 U.S.C. § 405(g) (emphasis added). The Supreme Court has defined "substantial evidence" to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).

It has been explained that:

7

> In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." The [Commissioner] may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the [Commissioner's] findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). Thus, the "court's function is a narrow one limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements." Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981). The Commissioner's decision must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987), cert. denied, 484 U.S. 1012 (1988).

### B. Mr. Jones' Motion to Reverse the Commissioner's Decision

Mr. Jones challenges the ALJ's denial of disability benefits on three grounds. He argues that (1) the ALJ's RFC determination was not supported by substantial evidence, (2) the ALJ's reliance on the VE's testimony was improper, and (3) the ALJ erred in assessing Mr. Jones' credibility.

#### a. ALJ's RFC Determination

Mr. Jones first argues that the ALJ's step four RFC determination was not based on the entire record. He contends that the ALJ did not consider (1) two medical evidence Exhibits that

documented low Global Assessment of Functioning ("GAF") scores, and (2) a Psychiatric Review form filled out by DDS psychiatrist Dr. Schniewind. [ECF No. 15-1 at 7-8].

Mr. Jones' argument is unavailing because an ALJ is not required to "expressly refer to each document in the record, piece-by-piece." Rodriguez v. Sec'y of Health & Human Serv., No. 90-1039, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990). Indeed, an officer's decision is conclusive if supported by substantial evidence, 42 U.S.C. § 405(g), even if that officer did not "directly address[] in his written decision every piece of evidence submitted by a party," NLRB v. Beverly Enterprises–Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999). The ALJ's RFC assessment explained the medical record in considerable detail and was ultimately supported by substantial evidence. In determining Mr. Jones' RFC, the ALJ considered Mr. Jones' testimony, the functional capacity assessment of his treating physician, and the treatment notes of his treating psychiatrist, all of which supported his RFC determination. [R. 25-28]. In particular, the ALJ carefully parsed Dr. Dmochowski's treatment notes, including the psychiatrist's observations, as well as the symptoms Mr. Jones reported, and the results of mental status examinations. [R. 27-28]. Following this thorough review, the ALJ concluded that Mr. Jones "retain[ed] the capacity to socially interact in a clinical setting, to maintain his personal appearance and grooming as well as to sustain attention and concentration while carrying out simple tasks." Id.

Mr. Jones nonetheless takes issue with the ALJ's failure to mention two GAF scores documented by Dr. Dmochowski. [ECF No. 15-1 at 7]. Dr. Dmochowski's December 2010 and October 2011 treatment notes both indicate that Mr. Jones had a GAF score of 48. [R. 428, 436].[1]

---

[1] "A GAF score of 41-50 indicates '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" Robertson v. Astrue, CIV.A. No. 11-

But the treatment notes also indicate that Mr. Jones scored a 60 and "possibly" a 70 within the past year. Id.[2] Moreover, "GAF scores are not dispositive when deciding whether a disability exists." Summers v. Astrue, CIV.A. No. 10-11792-DJC, 2011 WL 5508919, at *10, *22 (D. Mass. Nov. 10, 2011) (affirming ALJ's RFC determination notwithstanding plaintiff's argument that the decision "failed to consider the weight of [plaintiff's] GAF scores"). The GAF scale has "recently fallen into disfavor as an assessment tool," and in 2013 the Social Security Administration published Administrative Memorandum AM–13066 to guide ALJs on how to use GAF scores. Bourinot v. Colvin, 95 F. Supp. 3d 161, 178 (D. Mass. 2015). The SSA explained that standing alone, a GAF rating has limited probative value:

> By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

Id. (quoting AM-13066). Because the GAF scores at issue have limited probative value and the ALJ's RFC determination is supported by substantial evidence regardless of the scores, the RFC determination is proper.

---

30204-PBS, 2012 WL 4343650, at *2 n.4 (D. Mass. Sept. 20, 2012) (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., text revision 2000)).

[2] "A GAF score in the range of 51-60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Robertson, 2012 WL 4343650, at *1 n.2 (quoting DSM-IV). "A GAF score of 61-70 indicates '[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id. at *2 n.5.

Mr. Jones also complains that the ALJ did not consider the Psychiatric Review Technique form completed by Dr. Schniewind, a DDS consulting psychiatrist. According to Mr. Jones, Dr. Schniewind "felt that Jones' condition had symptoms that meet or equal either of two of the Secretary's Appendix I Listings . . . 12.04, depression and 12.06[,] anxiety." [ECF No. 15-1 at 7]. Setting aside the fact that these listings are relevant to step three, not step four, Mr. Jones misconstrues Dr. Schniewind's assessment. Dr. Schniewind did *not* opine that Mr. Jones' conditions met or equaled Listing 12.04 (affective disorder) or 12.6 (anxiety related disorders). To satisfy either Listing 12.04 or 12.06, a claimant must demonstrate that his condition meets the criteria of both paragraphs A and B, or A and C of the Listing. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1200A. Dr. Schniewind opined that Mr. Jones did not meet the criteria for either paragraphs B or C, and that he was therefore not disabled under the listings. [R. 406-407]. In fact, Dr. Schniewind's analysis suggests that Mr. Jones' limitations are less severe than those included in the ALJ's RFC determination. With respect to the Paragraph B criteria, Dr. Schniewind found that Mr. Jones had no restrictions in activities of daily living, no difficulties in maintaining social functioning, no episodes of decompensation of extended duration, and only mild difficulties in maintaining concentration, persistence, or pace. [R. 406].

In addition, the ALJ properly gave less weight to Dr. Schniewind's opinions because he is a consulting psychiatrist, rather than a treating source. [R. 396-409]. The opinions of non-treating sources are presumptively given less weight than treating sources unless other factors warrant granting more weight. See Weiler v. Shalala, 922 F. Supp. 689, 698 (D. Mass. 1996) ("[A]ll things being equal . . . [treating sources] will always [be] give[n] greater weight . . . than the opinion[s] of non-treating sources . . . .") (citing 56 F.R. 36932, 36936 (August 1, 1991)). Cf. Hagan v. Colvin, 52 F. Supp. 3d 167, 174 (D. Mass. 2014) (treating sources are presumptively

given controlling weight) (citing 20 C.F.R. § 404.1527(c)(2)). In making his RFC determination, the ALJ's decision to rely on the opinions of Mr. Jones' treating sources—Dr. Dmochowski and Dr. Mariano—over the consulting psychiatrist's form is consistent with this presumption.

### b. ALJ's Reliance on Vocational Expert Testimony

At step five, the ALJ relied on the testimony of a VE to determine whether, based on Mr. Jones' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Mr. Jones can perform. [R. 28-29]. The VE testified that Mr. Jones would be able to perform the requirements of "unskilled light occupations such as usher, locker room attendant and checkroom attendant." Id. Mr. Jones seems to contend that the VE testimony did not adequately account for his mental impairments. He argues that (1) the hypotheticals exchanged between the ALJ and VE did not fully account for the mental impairments included in the ALJ's RFC and (2) the jobs proposed by the VE are inconsistent with the mental impairments included in the ALJ's RFC. The Court rejects both of these arguments, finding that the ALJ properly obtained and relied on the VE's testimony.

Mr. Jones primarily contends that the ALJ erroneously relied on the VE's testimony because, in posing a hypothetical to the VE, the ALJ "did not ask the VE to consider the 'mental demands of unskilled work' and the likely limitations [Mr. Jones] would have because of his depression." [ECF No. 15-1 at 9]. The Court finds that the ALJ's reliance on the VE's testimony was proper because that testimony was given "in response to a hypothetical that accurately describe[d] claimant's limitations in the workplace." Sullivan v. Colvin, CIV.A. No. 14-13772-LTS, 2015 WL 5613163, at *5 (D. Mass. Sept. 24, 2015) (citing Souza v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011)). A hypothetical accurately describes a Social Security claimant's workplace limitations when (1) the hypothetical reiterates the ALJ's RFC assessment, and (2)

that RFC assessment is based on substantial evidence. Id. (citing Price v. Astrue, CIV.A. No. 11-11207-JGD, 2012 WL 4571752, at *9 (D. Mass. Sept. 28, 2012)). The ALJ's hypothetical reiterated the ALJ's RFC assessment. The VE first considered Mr. Jones' physical impairments to his "nearly useless major extremity." The VE testified that an individual could perform the "light work" required of an usher, locker room attendant, or checkroom attendant, even if that individual has "no use[] for the left hand." [R. 63]. The VE then considered Mr. Jones' mental impairments. After the VE determined that Mr. Jones could perform the work of an usher, locker room attendant, and checkroom attendant, the ALJ instructed the VE to consider those mental limitations the ALJ identified in his RFC determination, advising the VE that any "light work" he recommended must occur in a work setting that only changes occasionally; involves only occasional, superficial, and brief interaction with the general public; does not involve team-based interaction with coworkers; and does not have any production-based requirements. Id. at 65.

Mr. Jones contends that "[r]eading that entire exchange [between the ALJ and the VE] suggests that the VE was not taking into account the [limitations on] interacting with the public." [ECF No. 15-1 at 11]. He surmises that the VE was "focused on the production rate and seemed impressed that the jobs he had suggested have no production requirements." [ECF No. 15-1 at 11]. Mr. Jones inaccurately characterizes the record. When the ALJ was presenting the VE with the list of Mr. Jones' mental limitations, the VE interjected to seek clarification on the limitation that the "light work" must not have any production-based requirements. [R. 66]. Following the clarification, the ALJ asked the VE whether an individual with all of the aforementioned limitations—not just the production-based limitation—would be able to perform the work of an usher, locker room attendant, and checkroom attendant: "Given *those additions* to [the] hypothetical . . . would that reduce any of the types of jobs that you've given me?" Id. (emphasis

added). The VE responded, "No." Id. Accordingly, the VE responded to a hypothetical that incorporated all the limitations contained in the RFC.

Mr. Jones also argues that, even assuming the ALJ's hypotheticals fully accounted for his RFC, the ALJ should not have relied on the VE's testimony because the jobs proposed by the VE are inconsistent with the RFC. Specifically, Mr. Jones contends that the VE did not account for the limitations in Mr. Jones' ability to interact with the public. The ALJ's RFC provided that Mr. Jones was limited to unskilled jobs "that do not involve more than occasional superficial brief exchanges requiring no judgment with the public." Id. at 25. Mr. Jones now argues that "the very nature of the job of ushers and locker room attendants is interaction with the public." [ECF No. 15-1 at 11].

An ALJ must resolve conflicts or inconsistencies in a VE's testimony. Szumylo v. Astrue, 815 F. Supp. 2d 434, 438 (D. Mass. 2011) (citing Social Security Ruling 00-4p). This duty arises only when inconsistencies are both "apparent" and have been "identified" in the administrative hearing. Aho v. Comm'r of Soc. Sec. Admin., CIV.A. No. 10-40052-FDS, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011). An "apparent" inconsistency exists, for example, when the VE's "characterization of the exertional or skill level required for a particular job is facially different from the exertional or skill provided for that job in the DOT." Szumylo, 815 F. Supp. 2d at 441 (quoting Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000)) (internal quotations omitted). An ALJ need not resolve inconsistencies that are merely "latent" or "implied." See id. ("The conflict, if one exists is a latent one only; therefore, ALJs needn't resolve it at the hearing if no one notices it.") (citing Teskey v. Astrue, No. 1:10-cv-00758-JMS-MJD, 2011 WL 1636924, at *8 (S.D. Ind. Apr. 29, 2011)); Carey, 230 F.3d 131 ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony

of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error . . . .").

The VE's testimony is not "apparently" inconsistent with Mr. Jones' limitations—namely, that his work must involve only occasional, superficial, and brief interaction with the public. This is particularly true with respect to the VE's finding that Mr. Jones would be able to perform the work of a checkroom attendant, which Mr. Jones does not claim is inconsistent with his limitations. The most social interaction required of a checkroom attendant is taking "apparel, luggage, bundles, and other articles" for storage and then returning these articles. DOT § 358.677-010, 1991 WL 672954. This is consistent with the RFC's limitation that Mr. Jones' work require only occasional, superficial, and brief interaction with the public. This lack of "apparent" inconsistency between the duties of a checkroom attendant and Mr. Jones' RFC is alone enough to affirm the ALJ's step five finding. See Vega v. Astrue, C.A. No. 10-cv-30129-MAP, 2011 WL 4381946, at *6 (D. Mass. Sept. 19, 2011) (the "existence of only one . . . job precludes a finding of disability") (citing 20 C.F.R. §§ 404.1566(b), 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which you are able to meet . . . .") (emphasis added)).

There is also, however, no "apparent" inconsistency between Mr. Jones' limitations and the job duties of ushers and locker room attendants. Without citing to the DOT or any other authority, Mr. Jones asserts that "the very nature of the job of ushers and locker room attendants is interacting with the public." [ECF 15-1 at 11]. The DOT descriptions for these positions do indicate that both types of workers will at some point interact with the public. Consistent with the limitations that the ALJ communicated to the VE, however, some public interaction is tolerated provided that it is occasional, superficial, and brief. [R. 61-65]. The DOT descriptions

for these positions conform to this limitation. An usher, for example, interacts with the public, but largely limited to helping them find their seats, searching for lost articles, and locating facilities. DOT § 344.677-014, 1991 WL 672865. A locker room attendant's interactions with the public may be regarded as similarly occasional, superficial, and brief. A locker room attendant assigns facilities, supplies, and clothes to patrons. DOT § 358.677-014, 1991 WL 672955. A locker room attendant may also arrange for valet services and attend to the needs of athletic teams. Id. Beyond these limited tasks, a locker room attendant's duties do not require significant social interaction: attendants may collect and wash clothes, mop floors, clean shower and bathroom facilities, and pack uniforms and equipment. Id. Both ushers and locker room attendants therefore have only occasional, superficial, and brief interactions with the public, consistent with Mr. Jones' RFC.

Even if Mr. Jones could show that the VE's testimony was "apparently" inconsistent, he cannot show that the inconsistency was also "identified." A Social Security claimant cannot object to an allegedly "apparent" conflict when plaintiff's counsel fails to "inquire on the issue or to raise an objection to the vocational expert's testimony" during the administrative hearing. Aho, 2011 WL 3511518, at *14; see also Corcoran v. Astrue, CIV.A. No. 09-30230-KPN, 2011 WL 2023292, at *7 (D. Mass. Apr. 15, 2011) ("Plaintiff did not raise the issue of the consistency of the vocational expert's testimony with the DOT at the hearing or even in his appeal to the Appeals Council."); Pires v. Astrue, 553 F. Supp. 2d 15, 25 (D. Mass. 2008) ("Plaintiff's attorney did not object to the [vocational expert's] testimony . . . thus forgoing the opportunity to clarify which DOT numbers were relevant."). As reflected in the hearing transcript, Mr. Jones' counsel did not question or object to the VE's testimony, despite multiple opportunities to raise the issue. The ALJ asked counsel if he had any questions he wanted to "put" to the VE, [R. 66],

or if there was "[a]nything else that you think I need to know at this point?" [R. 67]. Mr. Jones' counsel declined on both counts. Id. Because Mr. Jones' counsel failed to raise the issue or object during the administrative hearing, he cannot now challenge the ALJ's failure to resolve an alleged inconsistency.

### c. ALJ's Credibility Assessment

Finally, Mr. Jones contends that the ALJ erred in assessing his credibility, arguing that the ALJ erroneously "discount[ed] and diminish[ed] the Plaintiff's testimony and allegations" concerning the daily activities that Mr. Jones is able to perform. [ECF No. 15-1 at 14]. In particular, Mr. Jones argues that the ALJ erred "by evaluating *some* but not the *entire* record." Id. (emphasis in original). The Court finds, however, that the ALJ correctly assessed Mr. Jones' credibility.

Although an ALJ must consider the entire record to assess a claimant's credibility, he is not required to explicitly address every piece of evidence. See Beverly, 174 F.3d at 26. Rather, as long as an ALJ's credibility determination is supported by substantial evidence, that decision is entitled to deference. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). To satisfy this deferential standard, an ALJ who decides to discredit a claimant's credibility must "make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); see also Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22 (1st Cir. 1986) ("[D]enial decisions must state why subjective testimony of limitation of function because of pain is not supported by the evidence."). The ALJ satisfied this requirement. After noting Mr. Jones' testimony and subjective complaints, the ALJ discussed the specific evidence that undermined the severity of his claims. The ALJ explained in detail how Dr. Dmochowski's

17

treatment notes contradicted Mr. Jones' subjective complaints and therefore called into question Mr. Jones' credibility. For example, the 2011 treatment notes indicated that Mr. Jones was pleasant and cooperative; was able to give goal directed responses without loose associations, flight of ideas, thought blocking or perseveration; had no gross deficits of cognition; had no impairment in immediate, recent, and remote memory; and had no impairment of attention or concentration. [R. 27]. Likewise, the 2010 treatment notes stated that Mr. Jones' insight and judgment were both good, and that attention, concentration, and recall of personal history were all intact. Id. From these notes, the ALJ reasonably concluded that "the claimant's testimony with respect to the degree of non-exertional limitations [was] not supported by the record." Id. The ALJ accordingly made specific findings, supported by substantial evidence, as to why he disbelieved Mr. Jones' subjective complaints, and the Court defers to this credibility finding.

## V. CONCLUSION

For all the reasons detailed herein, Plaintiff's Motion for Judgment [ECF No. 15] is DENIED, and the Defendant's Motion to Affirm the Commissioner's Decision [ECF No. 16] is GRANTED.

**SO ORDERED.**

Dated: March 31, 2016

/s/ Allison D. Burroughs  
ALLISON D. BURROUGHS  
U.S. DISTRICT COURT JUDGE